**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| Tristan Young,<br><br>　　　　Plaintiff,<br><br>v.<br><br>Arizona Summit Law School LLC, et al.,<br><br>　　　　Defendants. | No. CV-16-03490-PHX-DJH<br><br>**ORDER** |

Before the Court is a Motion for Summary Judgment filed by Defendants Arizona Summit Law School, LLC ("Summit") and InfiLaw Corporation ("InfiLaw") (Doc. 84). Plaintiff Ms. Tristan Young ("Ms. Young") filed a Response[1] (Doc. 95) and Defendants filed a Reply (Doc. 104).[2]

---

[1] Ms. Young's request for oral argument is denied because the parties have had an opportunity to adequately brief the issues and oral argument would not aid in the Court's resolution of the motion. *See* Fed. R. Civ. P. 78(b); LRCiv. 7.2(f); *Willis v. Pac. Mar. Ass'n*, 244 F.3d 675, 684 n.2 (9th Cir. 2001), *as amended* (Mar. 27, 2001).

[2] Also pending before the Court is the parties' Joint Motion to Seal Ms. Young's Exhibits to her Controverting Statement of Facts (Doc. 97). Therein, the parties provide that all of the information within these exhibits contain sensitive, confidential medical information concerning Ms. Young's mental and physical condition, along with her academic performance records. (*Id.* at 97). The Court finds that there is good cause to permit Ms. Young to file these exhibits under seal. Defendants and Ms. Young have also each filed a Motion to Exceed Statement of Facts Page Limits. (Docs. 102 & 103). The Court notes that neither party sought leave prior to filing their statement of facts that exceeded the page limits allowed pursuant to the Court's Rule 16 Scheduling Order (Doc. 44). Although the Court does not condone such disregard for its Orders, in the interest of litigating the issues, rather than deciding the issue on a procedural technicality, the Court will grant both Motions. However, the Court stresses that counsel for both parties must be mindful of the potential sanctions for violating this Court's orders.

## I. FACTUAL BACKGROUND[3]

Summit, previously known as Phoenix School of Law, was started in 2005. (Doc. 91 ¶ 1; Doc. 96 ¶ 1). InfiLaw is a consortium of independent, community-based law schools, and owns Summit. (Doc. 91 ¶ 9; Doc. 96 ¶ 9). Summit was not a traditional law school; it had a special mission to encourage and promote entry into the profession by groups who have been traditionally underrepresented. (Doc. 91 ¶¶ 2-4; Doc. 96 ¶¶ 2-4). So, admission to Summit was not based solely on collegiate grade point averages and/or LSAT scores. (Doc. 91 ¶ 4; Doc. 96 ¶ 4). Summit was also dedicated to having a diverse student body. (Doc. 91 ¶ 5; Doc. 96 ¶ 5). Thus, Summit provided equality of opportunity in legal education for all students, with respect to applicants for admission, enrolled students, and graduates, without discrimination, segregation or harassment on the grounds of race, color, religion, national origin, sex, age, disability, sexual orientation, gender identity, gender expression, or veteran status. (Doc. 91 ¶ 5; Doc. 96 ¶ 5). For disabled applicants or students, Summit implemented various policies and procedures addressing accommodations and/or other services and/or protections provided to these applicants or students. (Doc. 91 ¶ 6; Doc. 96 ¶ 6).

In recent years, Summit had various disputes with the American Bar Association ("ABA") about its accreditation status. Although Summit denied any basis for the ABA to remove its ABA accreditation status, in 2018 Summit made the decision to withdraw its appeal of the removal of its accreditation status. (Doc. 91 ¶ 16; Doc. 96 ¶ 16). On November 1, 2018, the Council of the Section of Legal Education and Admissions to the Bar of the ABA notified Summit that it has approved a Teach-Out Plan for any remaining Summit students, which shall conclude at the end of Spring 2020. (Doc. 91 ¶ 17; Doc. 96 ¶ 17). Most Summit students transferred to other law schools, and Summit only maintains a handful of employees to assist with any administrative or student matters up until the completion of the Teach-Out plan in 2020. (Doc. 91 ¶ 18; Doc. 96 ¶ 18). Following the

---

[3] Ms. Young has made numerous objections to Defendants' Statement of Facts. The Court has reviewed Ms. Youngs' objections, together with Defendants' Statements of Facts, Ms. Young's Controverting Statement of Facts, and underlying exhibits, and finds the undisputed material facts to be as recited in this section.

completion of the Teach-Out plant, Summit will be dissolved. (Doc. 91 ¶ 18; Doc. 96 ¶ 18).

Ms. Young was a Summit student from 2013 until November 2015, when she withdrew due to "personal reasons" and "academic concerns." (Doc. 91 ¶¶ 19-20; Doc. 96 ¶¶ 19-20, 199). Before Summit, Ms. Young received her bachelor's degree from Colorado State University ("CSU") and graduated with a 2.61 cumulative grade point average ("gpa"). (Doc. 91 ¶¶ 21-22; Doc. 96 ¶¶ 21-22). During her last year at CSU, Ms. Young prepared to take the LSAT by taking a Kaplan LSAT preparatory course and also by hiring a private tutor. (Doc. 91 ¶¶ 26-27; Doc. 96 ¶¶ 26-27). Ms. Young took the LSAT for the first time in October 2011 and received a score of 136. (Doc. 91 ¶ 28; Doc. 96 ¶ 28; Doc. 92 at 21).

During her final year at CSU and near the end of 2011, Ms. Young sought treatment from Dr. Jeremy Sharp and she was subsequently diagnosed in spring 2012 with the following impairments: Attention-Deficit/Hyperactivity Disorder; Bipolar II Disorder; Generalize Anxiety Disorder; Reading Disorder; and Mathematics Disorder. (Doc. 91 ¶¶ 23-24; Doc. 96 ¶¶ 23-24; Doc. 92 at 21). As a result of Dr. Sharp's diagnoses, in her last semester at CSU Ms. Young requested and received accommodations of time and a half on timed quizzes and exams in some of her classes. (Doc. 91 ¶ 25; Doc. 96 ¶ 25).

Following Dr. Sharp's diagnoses, and unhappy with her October 2011 LSAT score, Ms. Young decided to take the LSAT for a second time in the summer 2012. (Doc. 91 ¶ 29; Doc. 96 ¶ 29). This time, Ms. requested accommodations, including a request for time and a half to take the test. (Doc. 91 ¶ 31; Doc. 96 ¶ 31). That request was denied.[4] (Doc. 91 ¶ 32; Doc. 96 ¶ 32). Ms. Young took the LSAT in the summer 2012 without accommodations and again received a score of 136. (Doc. 91 ¶ 33; Doc. 96 ¶ 33). Ms. Young took the LSAT for a third time later that year and again received a score of 136.

---

[4] In her deposition, Ms. Young represented that she was a member of a class-action lawsuit against the Law School Admission Council, which administers the LSAT. (Doc. 92 at 22). The class-action action lawsuit alleged that the organization is in the habit of denying accommodation requests, even when applicants submit all the proper documentation and had a history of being granted testing accommodations by other organizations. Ms. Young stated that as a member of the class she recovered about $800.00 in spring 2015. (*Id.*).

(Doc. 91 ¶ 33; Doc. 96 ¶ 33). Ms. Young had a private tutor to help her prepare for all three of her LSAT tests. (Doc. 91 ¶ 34; Doc. 96 ¶ 34).

At some point following her LSAT tests, Ms. Young was contacted by a Summit employee to discuss whether she might be a candidate for admission at Summit. (Doc. 91 ¶ 34; Doc. 96 ¶ 34). Summit had instituted a program entitled Alternative Admissions Model for Legal Education ("AAMPLE"). (Doc. 91 ¶ 44; Doc. 96 ¶ 44). AAMPLE provided an opportunity for potential Summit students to participate in a seven-week on-line course taught by Summit professors, which addressed fundamental legal curriculum. (Doc. 91 ¶ 45; Doc. 96 ¶ 45). To the extent an individual was able to successfully complete the course, they would be offered the opportunity to enroll in Summit. (Doc. 91 ¶ 45; Doc. 96 ¶ 45). Ms. Young enrolled in AAMPLE and provided Summit with an Accommodation Verification form, which was completed by her doctor, Dr. Sharp, so that she could receive accommodations for AAMPLE. (Doc. 91 ¶ 47; Doc. 96 ¶ 47). The Accommodation Verification form provided that the following accommodations would assist Ms. Young in a classroom setting: "extended time (50%); laptop use; audio textbooks; [and] lecture notes in hard copy." (Doc. 92 at 105). However, in the accompanying Accommodation Request Form that was completed by Ms. Young on May 6, 2013, she only requested time and a half on the final AAMPLE exam. (Doc. 91 ¶ 50; Doc. 96 ¶ 50). Summit granted Ms. Young's accommodation request. (Doc. 91 ¶ 51; Doc. 96 ¶ 51). Ms. Young claims that she did not request other accommodations for AAMPLE, such as notetaking, because she felt she did not need additional accommodations and/or think those accommodations would be available for AAMPLE. (Doc. 91 ¶ 52; Doc. 96 ¶ 52).

After successfully completing AAMPLE and being admitted to Summit, Ms. Young requested accommodations for her upcoming classes just as she had done for AAMPLE. (Doc. 91 ¶ 53; Doc. 96 ¶ 53). In the Accommodation Request Form completed by Ms. Young on July 22, 2013, she requested time and a half for exams and a "private testing room." (Doc. 92 at 115).

In the 2013 fall term, Ms. Young received a C- in Introduction to Criminal Practice and Writing, a C+ in Intro to Transactional Practice I and a "pass" in Law School Foundations I and Intro to Legal Studies. (Doc. 92 at 125). Her cumulative GPA after the 2013 fall term was 1.92. (*Id.*) Ms. Young was subsequently notified in January 2014, that she was on academic probation because her cumulative GPA was below a 2.0. (Doc. 91 ¶ 73; Doc. 96 ¶ 73; Doc. 92 at 125). During the 2014 spring term, Ms. Young received a C+ in Intro to Civil Litigation I, a C- in Intro to Transactional Practice II, and a "pass" in Law School Foundations II. (*Id.*) Her cumulative GPA after the 2014 spring term was 2.15. (*Id.*)

In the 2014 summer term, Ms. Young received an F in Constitutional Law I, a C-in Intro to Civil Litigation II, and C in Legal Writing and Advocacy-Criminal Procedure. (Doc. 91 ¶ 75; Doc. 96 ¶ 75; Doc. 92 at 125). Her cumulative GPA after the 2014 summer term had fallen to a 1.83. (Doc. 92 at 125). In the 2014 fall term, Ms. Young received a C- in Evidence, C- in Professional Responsibility, a B in Criminal Procedure, and a "pass" in Mastering Legal Skills I. (Doc. 91 ¶ 77; Doc. 96 ¶ 77; Doc. 92 at 125). On her Evidence mid-term, Ms. Young believed that she had been improperly docked points because she incorrectly filled out her identification number on the Scantron sheet for the exam. (Doc. 91 ¶ 78; Doc. 96 ¶ 78). Specifically, Ms. Young alleged that on her prior exams, the accommodation proctor had checked the exams for "procedural accuracy" and she believed that her identification number typo would have been avoided if the accommodation protector reviewed her exam as had been done in the past. (Doc. 92 at 129). Following the 2014 fall term, Ms. Young's cumulative GPA was a 1.89. (Doc. 91 ¶ 81; Doc. 96 ¶ 81).

On January 16, 2015, Summit notified Ms. Young that, after her probationary term, she had failed to raise her cumulative GPA to a 2.00, and she was therefore academically dismissed from Summit. (Doc. 91 ¶ 82; Doc. 96 ¶ 82; Doc. 92 at 133). In response to the dismissal, Young submitted a Petition for Reinstatement. (Doc. 91 ¶ 83; Doc. 96 ¶ 83). Therein, Ms. Young stated that her poor academic performance was caused by extenuating

circumstance—namely, a romantic relationship that had turned toxic—and because her "accommodations [had] been neglected and ineffectively applied . . . ." (Doc. 92 at 128-30). Ms. Young also provided that she had already requested additional accommodations to ensure that the type of procedural mistake that occurred on her Evidence midterm would not happen again. (Doc. 92 at 130). In a February 2, 2015 letter, Ms. Young was notified that her petition for reinstatement was granted. (Doc. 91 ¶ 89; Doc. 96 ¶ 89). Ms. Young was also reminded that her cumulative GPA was 1.89 and that the reinstatement provided her with one term to attain a cumulative GPA of 2.00. (Doc. 92 at 139).

After reinstatement, Ms. Young continued to struggle academically. In the 2015 spring term, Ms. Young received a D in Advanced Property, a B- in Business Associations, a C+ in Immigration Law, a "pass" in Mastering Legal Skills 2, and a "pass" in Real Estate Transactions. (Doc. 91 ¶ 90; Doc. 96 ¶ 90; Doc. 95 at 126). Following the 2015 spring term, Ms. Young's cumulative GPA was a 1.91. (Doc. 92 at 126). Ms. Young attributes her poor grade on the Advanced Property final exam to the fact that the proctor erroneously gave her the wrong property exam twice, so she had to restart the exam twice. (Doc. 96 ¶ 189). On June 11, 2015, Summit notified Ms. Young that because her cumulative GPA was less than a 2.00, and she was therefore academically dismissed from Summit. (Doc. 91 ¶ 92; Doc. 96 ¶ 92). Ms. Young subsequently submitted her second Petition for Reinstatement and appealed her Advanced Property grade. (Doc. 91 ¶ 93; Doc. 96 ¶ 93). Summit granted Ms. Young's second Petition for Reinstatement, but denied her grade appeal. (Doc. 91 ¶ 94; Doc. 96 ¶ 94).

In the 2015 summer term, Ms. Young received a C- in Constitutional Law I, after having failed the course in the 2014 summer term; a D in Community Property, an A- in Law Office and Client Management; and a "pass" in Mediation. (Doc. 92 at 126). Ms. Young attributes her success in Constitutional Law, in part, to a tutor provided by Summit. (Doc. 91 ¶ 95; Doc. 96 ¶ 130; Doc. 92 at 36). Ms. Young found the Constitutional Law tutor to be helpful, but she did not seek a tutor for other classes. (Doc. 91 ¶ 96; Doc. 96 ¶ 131). Ms. Young also received hard copy notes for Constitutional Law and Community

Property. (Doc. 91 ¶¶ 97-99; Doc. 96 ¶¶ 98-99, 131). Pursuant to Summit's policy at the time, Ms. Young's original Constitutional Law grade and the grade she earned repeating the class both appeared on her transcript. (Doc. 91 ¶ 97; Doc. 96 ¶¶ 179, 185; Doc. 96-1 at 16-17). Following the 2015 summer term, Ms. Young had a 1.93 cumulative GPA. (Doc. 92 at 126).

On September 3, 3015, Ms. Young was notified that she was again academically dismissed because her GPA was below a 2.0. (Doc. 91 ¶ 100; Doc. 96 ¶ 100; Doc 92 at 155). Ms. Young submitted her third Petition for Reinstatement. (Doc. 91 ¶ 102; Doc. 96 ¶ 102). This Petition was subsequently granted on September 10, 2015; however, the fall 2015 term had already begun by the time her petition was granted. (Doc. 91 ¶ 102; Doc. 96 ¶ 102). For that term, Ms. Young registered for Designing Land Use Policies, Family Law, and Transactional Clinic-Mediation. (Doc. 92 at 126). Designing Land Use Policies had a policy that students were not allowed more than two absences during the entirety of the term and Ms. Young had been absent from one Designing Land Use Policies class while she was academically dismissed and awaiting Summit's decision on her Petition for Reinstatement. (Doc. 96 ¶ 174). Aside from the one Designing Land Use Policies class she had missed while academically dismissed, Ms. Young had two more absences in October. (*Id.*) Subsequently, Ms. Young was notified that she had been removed from Designing Land Use Policies because she had missed more than two classes. (Doc. 92 at 160). Ms. Young petitioned for reinstatement in Designing Land Use Policies, arguing that the absence while she was academically dismissed should not be counted against her. (Doc. 96 ¶ 176). Summit disagreed and denied her petition. (Doc. 100 at 4). Ms. Young withdrew from Summit on November 17, 2015, citing "personal reasons & academic concerns." (*Id.* at 5).

**II.     PROCEDURAL HISTORY**

Ms. Young filed her Complaint on October 12, 2016, alleging that Defendants: (1) violated the Rehabilitation Act of 1972 ("Rehabilitation Act"), 29 U.S.C. § 794, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12182; (2) committed negligent

misrepresentation; and (3) committed common law fraud. (Doc. 1 ¶¶ 106-130). Defendants filed a Motion to Dismiss Ms. Young's negligent misrepresentation and common law fraud claims. (Doc. 34). The Court granted Defendants' Motion to Dismiss (Doc. 39), and therefore, the only surviving claim is her claim that Defendants violated Title III of the ADA and Section 504 of the Rehabilitation Act.

On September 21, 2018, without leave of the Court, Ms. Young filed an Amended Complaint, which included claims on behalf of a putative class. (Doc. 50). Defendants moved to strike Ms. Young's Amended Complaint, arguing that it was improperly filed without leave of the Court. (Doc. 53). The Court granted Defendants' Motion to Strike, finding that Ms. Young failed to seek leave of the Court prior to filing her Amended Complaint in violation of Federal Rule of Civil Procedure ("Rule") 15(a)(2). (Doc. 63).

On February 6, 2019, Ms. Young filed a Motion to Amend Complaint, which Defendants opposed. (Docs. 64, 67). The Court denied Ms. Young's Motion to Amend Complaint, finding that she was not diligent in seeking to amend and did not meet her burden of showing good cause under Rule 16. (Doc. 70). On June 28, 2019, Defendants filed the pending Motion for Summary Judgment on Ms. Young's remaining claims for violations of Title III of the ADA and Section 504 of the Rehabilitation Act.

**III.   LEGAL STANDARD**

To grant summary judgment, the Court must determine that the record before it contains "no genuine issue as to any material fact" and, thus, "that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party "initially bears the burden of proving the absence of a genuine issue of material fact." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In determining whether to grant summary judgment, the Court will view the facts and inferences from these facts in the light most favorable to the nonmoving party. *See id.*

at 587.

The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A material fact is any factual dispute that might affect the outcome of the case under the governing substantive law. *Id*. at 248. A factual dispute is genuine if the evidence is such that a reasonable jury could resolve the dispute in favor of the nonmoving party. *Id*. A party opposing a motion for summary judgment cannot rest upon mere allegations or denials in the pleadings or papers, but instead must set forth specific facts demonstrating a genuine issue for trial. *See id*. at 250. Finally, if the nonmoving party's evidence is merely colorable or is not significantly probative, a court may grant summary judgment. *See, e.g., California Architectural Build. Prods., Inc. v. Franciscan Ceramics*, 818 F.2d 1466, 1468 (9th Cir. 1987).

IV.  **ANALYSIS**

Ms. Young argues that Defendants violated Title III of the ADA and Section 504 of the Rehabilitation Act because she "disclosed her disabilities to [Summit], and [Summit] having recognized them as important and worthy of reasonable modifications, . . . (1) refused to provide and enforce those modifications, (2) refused to interact with [Ms. Young] to determine if it was providing modifications that were appropriate for her, and (3) refused to consider making modifications to any of its policies, however easy, helpful, or consistent with its academic program." (Doc. 95 at 4).

Aside from certain variations in substantive coverage that are not relevant here, Title III of the ADA and Section 504 of the Rehabilitation Act provide disabled individuals with essentially identical protections against discrimination. *See Zulke v. Regents of the Univ. of California*, 166 F.3d 1041, 1045 n.11 (9th Cir. 1999) (describing the ADA and Rehabilitation Act as creating the same rights and obligations). Title III of the ADA guarantees that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or

accommodations of any place of public accommodation," 42 U.S.C. § 12182(a), which includes all "postgraduate private schools, or other places of education[.]" 42 U.S.C. § 12181(7)(J). Section 504 of the Rehabilitation Act provides, in pertinent part, that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance," 29 U.S.C. § 794(a), which includes any "college, university, or other postsecondary institution" that accepts federal grants. 29 U.S.C. § 794(b)(2)(A).

The Court construes the ADA and Rehabilitation Act similarly. *See Zulke*, 166 F.3d at 1045 n.11. These statutes require a plaintiff to demonstrate the same elements to establish liability. *Lesofski v. Lash*, CV 11-840 TUC DCB, 2012 WL 4711909, at *3 (D. Ariz. Oct. 3, 2012) (citing *Bowers v. NCAA*, 475 F.3d 524, 535 n.12 (3d Cir. 2007)). Therefore, in the interest of brevity and in recognition of the doctrinal overlap between the two statutes, the Court will evaluate Ms. Young's Rehabilitation Act and ADA claims together.

The ADA defines discrimination, among other things, as "a failure to make reasonable modifications" that are "necessary" to provide a disabled individual with such full and equal enjoyment, "unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations." *Id*. § 12182(b)(2)(A)(ii). Similarly, a failure to provide reasonable accommodations can also constitute discrimination under the Rehabilitation Act. *Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir. 2002). However, a disabled individual is not entitled to whatever modification she thinks might accommodate her limitations. Nor is she entitled to obtain an advantage over her non-disabled peers. Rather, the ADA and the Rehabilitation Act mandates that educational institutions make only those reasonable modifications that are *necessary* to give a disabled individual the same opportunity to obtain the offered benefit that she would have had were it not for the limitations caused by her disability—and, even then, only to the extent that the necessary

modifications *would not fundamentally alter* the nature of that benefit. *See Long v. Howard Univ.*, 439 F. Supp. 2d 68, 76 (D. D.C. 2006).

In order to establish a *prima facie* case of discrimination based upon disability in violation of the ADA and Rehabilitation Act, Ms. Young must provide evidence that: (1) she was "disabled" as defined by the ADA and Rehabilitation Act; (2) she was a qualified student, meaning that she could meet the essential eligibility requirements of the school with or without reasonable accommodation; (3) she was discriminated against solely because of her disability; and (4) the school received federal financial assistance (for the Rehabilitation Act claim) or was a public entity (for the ADA claim). *See Wong v. Regents of the Univ. of Cal.*, 410 F.3d 1052, 1057 (9th Cir. 2005).

Defendants do not dispute that Ms. Young is disabled, that Summit receives federal financial assistance, or is a public entity. Rather, Defendants argue that Ms. Young's failure to accommodate claims fail as a matter of law because she has not presented any evidence from which a reasonable jury could find that she was discriminated against solely because of her disability. Additionally, Summit argues that Ms. Young was not a qualified student.

Ms. Young's failure to accommodate claim is threefold. She argues that Summit failed to accommodate her by: (1) failing to provide her with accommodations that she requested, (2) failing to participate in an interactive process to discuss the reasonable accommodations that could have benefited her, and (3) failing to proactively modify its academic policies to ensure she could achieve academic success. (Doc. 95 at 2-15).

### A. Failure to Provide Requested Accommodations

An underlying assumption of any reasonable accommodation claim is that the plaintiff-student has requested an accommodation which the defendant-school has denied. *See Colombini v. Members of Bd. of Directors of Empire Coll. Sch. of Law*, 2001 WL 1006785, at *7 (N.D. Cal. Aug. 17, 2001) (noting that in order to be denied an accommodation, the student must have first requested the accommodation), *aff'd sub nom. Colombini v. Members of Bd. of Directors*, 61 Fed. Appx. 387 (9th Cir. 2003); *see also*

*Buescher v. Baldwin Wallace Univ.*, 86 F.Supp.3d 789, 806 (N.D. Ohio 2015) ("[S]he did not request an accommodation for her disability and there can be no failure to accommodate."); *Pierre v. Univ. of Dayton*, 143 F. Supp. 3d 703, 709 (S.D. Ohio 2015) (holding that plaintiff could not succeed on his failure to accommodate claim because he never requested an accommodation); *Carlson v. Carroll Univ.*, 2011 WL 5921445, at *14 (E.D. Wis. Nov. 28, 2011) (dismissing plaintiff's claim for failure to accommodate because she provided no evidence that she requested accommodations); *Forbes v. St. Thomas Univ., Inc.*, 768 F. Supp. 2d 1222, 1231 (S.D. Fla. 2010) (noting that a student's failure to request an accommodation through the official process can be fatal to a student's claim of failure to provide a requested accommodation).

It is undisputed that Ms. Young requested accommodations for the AAMPLE program using Summit's Accommodation Request Form and providing Summit with a copy of the Accommodation Verification form completed by Dr. Sharp. (Doc. 96 ¶¶ 47-51). Specifically, Ms. Young only requested time and a half on the final AAMPLE exams, even though Dr. Sharp recommended time and half on exams, laptop use, audio textbooks, and an advanced hard copy of lecture notes. (Doc. 92 at 105, 108). Furthermore, Ms. Young does not dispute that she was provided with time and a half for her AAMPLE exam. (*Id.* ¶¶ 49-51). Prior to beginning regular Summit classes, Ms. Young completed a second Accommodation Request Form. In her second Accommodation Request Form, Ms. Young requested time and a half on exams and a private testing room for exams. (Doc. 92 at 115). That request was approved. In sum, all of the accommodations that Ms. Young requested in accordance with Summit's policy for requesting accommodations were granted.

However, Ms. Young also claims that Summit "agreed to implement every specific recommendation that [Dr. Sharp] had made" in the Accommodation Verification form. (Doc. 100 at 12). She also claims she requested and was granted proofreading as accommodations from the very beginning of her time at Summit. (Doc. 96 ¶ 137; Doc. 92 at 14). Additionally, Ms. Young claims that she requested notetaking as a modification from the very beginning of her time at Summit. (Doc. 96 ¶ 135). To support those claims,

Ms. Young almost solely relies on her affidavit that accompanies her Response to Defendants' Motion. (Doc. 96 ¶¶ 132-37 ) (citing Doc. 100 at 7-16)). However, "[a] conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact." *See F.T.C. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997). Moreover, much of her affidavit conflicts with her prior deposition testimony. Where deposition testimony and affidavit statements are in conflict, the Court may disregard the affidavit unless there is a plausible explanation for the incongruity. *Adusumilli v. City of Chicago*, 164 F.3d 353, 360 (7th Cir. 1998). For example, when asked at her deposition why she didn't request proofreading, Ms. Young conceded, "I don't know. I should have." (Doc. 92 at 31). Ms. Young further conceded that she did not request accommodations other than a private testing room and time and half on her exams because she was told by the Summit Disability Accommodation Director, Debra Love, that Summit would not provide other accommodations. (*Id.*) In contradiction, in her affidavit, Ms. Young claims that Summit failed to "provide proofreading, a modification they had already approved . . . ." (Doc. 100 at 15).

Summit provided students with guidelines for how to request accommodations and specifically notified its students that "[i]t is the responsibility of the student to request accommodations by completing all required forms . . . ." (Doc. 91-1 at 46). In fact, Ms. Young requested accommodations on two different occasions using the required forms. Ms. Young alleges that "[t]here was nothing easy about seeking or gaining appropriate accommodations" at Summit, but notably, she does not allege that she did not know how to request accommodations, that she was prevented from requesting accommodations, or that Summit's accommodation request procedure was unreasonable. (Doc. 96 ¶ 136).

Thus, the crux of Ms. Young's argument is that Summit should have provided her with all accommodations that it was on notice could benefit her. This argument is flawed. Summit was not required to speculate as to the extent of Ms. Young's desire for an accommodation. *See Bedeski v. Boeing Co.*, 2015 WL 5675427, at *3 (W.D. Wash. Sept. 25, 2015) ("An employer is not required to speculate as to the extent of an employee's

disability or the employee's need or desire for an accommodation.") (quoting *Gantt v. Wilson*, 143 F.3d 1042, 1046–47 (6th Cir. 1998)). Where the school has established reasonable procedures for making and handling accommodation requests, it may expect its students to utilize those procedures absent extenuating circumstances. *See Bedeski*, 2015 WL 5675427, at *3 (citing *Edwards v. U.S. Envt. Prot. Agency*, 456 F. Supp. 2d 72, 102–03 (D. D.C. 2006) ("[A]n employee's oral request cannot trump an employer's established procedure for requesting and approving disability accommodations.")).

Ms. Young was well aware of Summit's established procedures for requesting accommodations. Although, she provides that "[t]here was nothing easy about seeking or gaining appropriate accommodations" at Summit, she fails to identify, with any particularity, how Summit's established procedure was difficult or prevented her from requesting accommodations. (Doc. 96 ¶ 135). Ms. Young argues that Summit should have construed Dr. Sharp's Accommodation Verification form as a request for all of his suggested accommodations; however, that would have required Summit to speculate which accommodations Ms. Young wanted and would have been directly contrary to the accommodation form that she herself completed. In these circumstances, the Court finds that the receipt of Dr. Sharp's Accommodation Verification form, without a corresponding accommodation request from Ms. Young, does not satisfy Ms. Young's obligation to request an accommodation.

Accordingly, Summit can only have failed to provide accommodations that Ms. Young requested through Summit's accommodation request procedure. Every time Ms. Young initiated a request for accommodation using Summit's accommodation forms, the accommodation was granted.[5] Summit cannot be liable for failing to provide Ms. Young

---

[5] Ms. Young does note that there was an issue with her accommodation for her Advanced Property final exam. (Doc. 95 at 14). Specifically, the proctor accidently gave Ms. Young the wrong exam twice, which required her to restart the exam twice. (*Id.*) However, Ms. Young fails to appreciate that despite the proctor's mistake, she was still given time and half on the exam and took the exam in a private testing room. In other words, although the proctor did mistakenly give her the wrong exam twice, she was still provided her accommodations. Thus, while the ADA and Rehibition Act require reasonable accommodations, they do not require *perfect* accommodations. *See e.g., Updike v. Multnomah County*, 870 F.3d 939, 951-52 (9th Cir. 2017) (finding no ADA violation where the state failed to timely provide an ADA accommodation due to "bureaucratic slippage,"

with requested accommodations because it provided her with every accommodation that she requested through Summit's accommodation request procedure.

### B. <u>Failure to Participate in an Interactive Process</u>

Ms. Young, without appropriate citation,[6] claims that "[i]t is the law of this Circuit that once a school recognizes that a student is disabled, the school has an affirmative obligation to work with the student to determine what sort of modification may be 'appropriate' to even the playing field for her." (Doc. 95 at 13). Plaintiff states that the "[f]ailure to 'engage in an interactive process with the [student][7] to determine the appropriate reasonable accommodation' violates the law." (*Id.* at 14) (alteration in original) (quoting *Baker v. Dupnik*, 2011 WL 13183250, at *27 (D. Ariz. Mar. 31, 2011). However, Plaintiff's argument is based on the ADA's requirements in the employment context, not the public accommodation context.

The Ninth Circuit has held that the ADA's interactive process requirement applies only to ADA employment related cases, not ADA public accommodation cases. *See Tauscher v. Phoenix Bd. of Realtors, Inc.*, 931 F.3d 959, 964 (9th Cir. 2019) (holding that Title I of the ADA requires an employer "initiate an informal, interactive process with the individual with a disability in need of the accommodation"; however, Title III of "[t]he ADA does not make this 'interactive process' requirement applicable to public accommodations and services."). In the employment context, "[o]nce an employer becomes aware of the need for accommodation, that employer has a mandatory obligation under the [Title I of the] ADA to engage in an interactive process with the employee to identify and implement appropriate reasonable accommodations." *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1137 (9th Cir. 2001). However, Title III of the ADA and its implementing regulations make no mention of an "interactive process" that mirrors the

---

even though such error caused plaintiff to spend an extra night in jail).

[6] The only citation provided for this proposition relates to whether Plaintiff's marijuana use precludes her from being a qualified student. (Doc. 95 at 13 n.4).

[7] Plaintiff has altered this quotation by replacing "employee" with "student." This is a material alteration.

process required in the employment context. *Tauscher*, 931 F.3d at 964.

As Ms. Young's claim is pursuant to Title III of the ADA, there was no requirement for Summit to engage in an interactive process. Therefore, Ms. Young's allegation that Summit's alleged failure to "ask [her] what [accommodations] she might need" violated Tile III of the ADA fails as a matter of law. (Doc. 95 at 13). Moreover, if Summit did have such a duty, Ms. Young failed to participate in the interactive process because she ignored Summit's protocol pertaining to requesting accommodations. *See Williamson v. Clarke County Dept. of Human Res.*, 834 F. Supp. 2d 1310, 1321 n.16 (S.D. Ala. 2011) (an employee fails to participate in the interactive process in good faith when he ignores instructions to fill out the employer's accommodation request form and submit necessary documentation).

### C. Failure to Modify its Academic Policies

Plaintiff contends that "[b]ecause [Ms.] Young's disabilities caused her to run squarely into various [Summit] policies. . .—policies that if modified would have removed stumbling blocks associated with [Ms.] Young's disabilities—[Summit] was obligated to modify these policies for her." (Doc. 95 at 17). Essentially, Ms. Young is arguing that Summit violated the ADA and Rehabilitation Act because it did not proactively lower its academic standards to ensure that she receive passing grades in her classes and remain a Summit student. However, Ms. Young has not established that she requested any policy modifications; rather, she appears to be arguing that Summit should have recognized that certain changes to its academic polices would have benefited her and then proactively changed these policies. Neither the ADA nor the Rehabilitation Act require an academic institution to proactively fundamentally alter its academic standards to ensure that a student can pass.

As previously discussed in this Order, an underlying assumption of any failure to make reasonable accommodations claim, including a failure to make reasonable modifications to its policies, is that the student has requested the policy modifications. *Chenari v. George Washington Univ.*, 172 F. Supp. 3d 38, 54 (D.D.C. 2016), *aff'd*, 847

F.3d 740 (D.C. Cir. 2017). Otherwise, an academic institution would have to speculate what policy modifications could potentially benefit a student with a disability and then it would have to proactively make those changes. That would be an untenable position for an academic instruction to be in. Accordingly, Ms. Young's claim that Summit failed to reasonably modify its academic policies fails as a matter of law.

## V. CONCLUSION

For all of the foregoing reasons, the Court will grant Defendants' Motion for Summary Judgment. Ms. Young has failed to raise a genuine issue of material fact regarding her failure to accommodate claims, and Defendants are entitled to judgment as a matter of law.

Accordingly,

**IT IS ORDERED** that Defendants' Motion for Summary Judgment (Doc. 84) is **GRANTED**. The Clerk of Court is respectfully directed to enter judgment accordingly.

**IT IS FURTHER ORDERED** that the parties Joint Motion to Seal Plaintiff's Exhibits to her Controverting Statement of Facts (Doc. 97) is **GRANTED**. The Clerk of Court is respectfully directed to seal documents currently lodged at Docs. 98, 99, 100, and 101.

**IT IS FINALLY ORDERED** that Plaintiff's Motion for Leave to Exceed Contravening Statement of Facts Page Limits (Doc. 102) and Defendants' Motion for Leave to Exceed Statement of Facts Page Limits (Doc. 103) are **GRANTED**.

Dated this 27th day of February, 2020.

Honorable Diane J. Humetewa
United States District Judge